UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
CLARA MUNOZ-FELICIANO,

                              Plaintiff,                                    No. 13-CV-4340 (CS)

        -against-                                                           **OPINION & ORDER**

MONROE-WOODBURY CENTRAL SCHOOL
DISTRICT, New York; DR. MICHAEL
DIGERONIMO, in his capacity as President of the Board
of Education of the Monroe-Woodbury Central School
District; EDWARD MEHRHOF, individually and in his capacity as
Superintendent of the Monroe-Woodbury School District;
JENNIFER TRUMPER, individually and in her capacity as
Member of the Board of Education of the Monroe-Woodbury
Central School District; HUGH CAUTHERS, individually and in
his capacity as Chief Information Officer of the Monroe-Woodbury
Central School District; JOHN DOES 1 THROUGH 10, individually
and in their capacities as officials, agents, employees and/or
administrators of the Monroe-Woodbury Central School District
and/or as present and/or former members of the Board of Education
of the Monroe-Woodbury Central School District; and JOHN DOES
11 THROUGH 20, individually and in their capacities as teachers,
employees, and/or agents of the Monroe-Woodbury Central School
District,

                              Defendants.

------------------------------------------------------------------------x

Appearances:

Jimmy M. Santos
Law Offices of Jimmy M. Santos, PLLC
Cornwall, New York
*Counsel for Plaintiffs*

Adam I. Kleinberg
Garry T. Stevens, Jr.
Sokoloff Stern LLP
Carle Place, New York 11514
*Counsel for Defendants*

Seibel, J.

Before this Court is Defendants' Motion to Dismiss, (Doc. 23), Plaintiff's Cross-Motion to Amend her First Amended Complaint, (Doc. 26), and Plaintiff's Motion for Conference requesting oral argument on the pending motions, (Doc. 33). For the reasons stated below, Defendants' motion is GRANTED, and Plaintiff's motions are DENIED.

## I.  Background

The facts (although not the conclusions) of the First Amended Complaint ("AC"), (Doc. 15), are assumed to be true for purposes of these motions.

### A.  The Parties

#### 1.  Plaintiff

Plaintiff Clara Munoz-Feliciano is a resident within the Monroe-Woodbury Central School District (the "District"), in Orange County, New York. (AC ¶ 2.) From approximately 2008 until 2009, Plaintiff served as Vice President of the Special Education Parent Teacher Association ("SEPTA"), an organization that advocates on behalf of students with special needs who may be eligible to receive special education services. (*Id.* ¶ 17.) In May 2012, Plaintiff ran unsuccessfully for a seat on the District Board of Education (the "District Board"). (*Id.* ¶¶ 22, 29.)

#### 2.  Defendants

Defendant District is a municipal corporate subdivision of the State of New York. (*Id.* ¶ 3.) In addition to the District, Plaintiff names as Defendants, in both their official and individual capacities, Michael DiGeronimo, President of the District Board; Edward Mehrhof, Superintendent of the District; Jennifer Trumper, a member of the District Board; Hugh Cauthers, Chief Information Officer ("CIO") of the District; John Does One through Ten

(officials, agents, employees and/or administrators, and/or current or former members of the

District Board); and John Does Eleven through Twenty (teachers, employees, and/or agents of

the District).  (*Id.* ¶¶ 4-9.)

### B.  The Facts as Alleged in the Complaint

#### 1.  The Events Prior and Leading Up to the May 2012 Election

Plaintiff alleges that, during her tenure as Vice President of SEPTA, approximately 2008-

2009, she voiced her concerns at various public meetings – with unspecified District

administrators present – regarding the District's level of support and services for students with

special needs.  (*Id.* ¶ 17.)  Approximately two years later, in March or April of 2011, following

the suicide of one or more District students, Plaintiff attended "one (1) or more Board [of

Education] meetings" at which she advocated for the District's implementation of more effective

suicide prevention and intervention programs.  (*Id.* ¶ 18.)  Later, "[i]n or about May 2011,"

Plaintiff attended a meeting sponsored by the District and a group called "For Those Who Care."

At this meeting, Plaintiff voiced (1) concerns regarding the meeting format, which allegedly

prohibited audience participation during the presentation, and (2) her opinion that the District's

suicide prevention and intervention programs were inadequate for at-risk students.  (*Id.* ¶¶ 19-

20.)  In attendance were an unidentified District principal, assistant principal and guidance

counselor.  (*Id.* ¶ 19.)  Plaintiff also, in various public forums and at unspecified times – but

ending before May 12, 2012 – voiced her concerns that the District was not adequately

addressing the issue of student bullying.  (*Id.* ¶ 21.)  The Court will refer to these statements by

Plaintiff, collectively, as the "Pre-Campaign Statements."

In approximately April or early May 2012, Plaintiff decided to run for a position on the

District Board.  (*Id.* ¶ 22.)  As part of her campaign platform, Plaintiff publicly announced:  (1)

"it is time to put the needs of the children first;" (2) "as Vice President of SEPTA in 2008, I understand the importance of children with special education needs and those of the gifted and talented;" and (3) with respect to [an audit report by the New York State Comptroller examining misappropriation of public funds], "I believe the trust that needs to be repaired can be addressed . . . through good communication and transparency by restoring partnership between community members, parents and students."  (*Id.*)  The Court will refer to these statements made by Plaintiff in relation to her 2012 campaign for District Board as the "Campaign Statements."

Prior to the Board election on May 15, 2012, allegedly as a result of Plaintiff's Campaign Statements and her Pre-Campaign Statements beginning in 2008, Defendants engaged in a purported "smear campaign" against not only Plaintiff, but two other candidates seeking positions on the District Board.  (*Id.* ¶ 23.)  Plaintiff claims the "smear campaign" was conceived and implemented "with the approval, directive and/or direction of the [Defendants] and the use of District (public) resources/funds."  (*Id.* ¶ 24.)  Plaintiff cites to four documents – three emails and one campaign flyer, all disseminated prior to the 2012 election – which she appears to identify as constituting the "smear campaign."  (*See id.* ¶¶ 23-26, Exs. A-C.)  More than one month after the 2012 election, on June 21, 2012, these statements were re-published in "several news outlets."  (*Id.* ¶ 31.)

### 2.  The Events After the May 2012 Election

Plaintiff, along with the two other candidates who Plaintiff claims were subjects of the "smear campaign," lost the May 2012 election.  (*Id.* ¶ 29.)  After her loss, Plaintiff alleges she was again subjected to retaliation for her Pre-Campaign and Campaign Statements when the District denied home schooling accommodations for Plaintiff's daughter, CLF, a District student.  (*Id.* ¶ 27.)  Plaintiff further alleges that in retaliation for her Pre-Campaign and Campaign

Statements, the District failed to discipline certain students who "committed assault and battery" against CLF.  (*Id.* ¶ 28.)  Additionally, approximately one year after the election, on May 13, 2013 – allegedly in retaliation for the same Pre-Campaign and Campaign Statements – Defendant Cauthers, on behalf of Defendant Mehrhof, sent an email expressing Mehrhof's dismay about Plaintiff distributing campaign literature during a faculty-appreciation reception (the "Mehrhof Email").  (*Id.* ¶ 32, Ex. D.)

### C.  The Present Action

Plaintiff filed this action on June 21, 2013.  (*See* Doc. 1.)  After a pre-motion conference on December 20, 2013, she filed the AC on January 21, 2014, asserting claims for First Amendment retaliation pursuant to 42 U.S.C. § 1983 and for defamation under New York State law.  On February 20, 2014, Defendants moved to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  (Doc. 23.)  Defendants argue that Plaintiff fails to state a claim pursuant to Section 1983, and that Plaintiff's state-law claims are both procedurally barred and time-barred.

Plaintiff has filed a Cross-Motion to Amend her AC, (Doc. 26), to which she has attached her Proposed Amended Complaint ("PAC"), (Declaration of Jimmy M. Santos ("Santos Decl."), (Doc. 27), Ex. 1).  Plaintiff was granted permission to file the motion because Defendants, in their Motion to Dismiss, raised a new ground for dismissal not mentioned in their pre-motion letter.

## II.  Discussion

### A.  Standard of Review

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Twombly*, 550 U.S. at 555 (alteration, citations, and internal quotation marks omitted).  While Federal Rule of Civil Procedure 8 "marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, . . . it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."  *Iqbal*, 556 U.S. at 678-79.

In considering whether a complaint states a claim upon which relief can be granted, the court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determines whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief."  *Id.* at 679.  Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.*  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to relief.'"  *Id.* (alteration omitted) (quoting Fed. R. Civ. P. 8(a)(2)).

**B.  Plaintiff's Claims**

**1.  Section 1983 Claim**

Section 1983 provides in pertinent part that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . . ."  42 U.S.C. § 1983.  To state a claim for relief in an action pursuant to Section 1983, a plaintiff must establish (1) the deprivation of a right secured by the Constitution or laws of the United States, and (2) that the alleged deprivation was committed under color of state law.  *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49-50 (1999).

**a.  Under Color of State Law**

"'To constitute state action, the deprivation must be caused by . . . a person who may fairly be said to be a state actor.'"  *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 230 (2d Cir. 2004) (quoting *West v. Atkins*, 487 U.S. 42, 49 (1988)).  A public employee is generally considered a state actor "while acting in his official capacity or while exercising his responsibilities pursuant to state law."  *Id.*  "However, mere employment by the state does not mean that the employee's every act can properly be characterized as state action."  *Id.*  The "personal pursuits" of state officials "do not give rise to section 1983 liability," *Pitchell v. Callan*, 13 F.3d 545, 548 (2d Cir. 1994); *Warheit v. City of New York*, No. 02-CV-7345, 2006 WL 2381871, at *9 (S.D.N.Y. Aug. 15, 2006), *aff'd*, 271 F. App'x 123 (2008), because "the under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no

matter how discriminatory or wrongful," *Williams v. Jurow*, No. 05-CV-6949, 2007 WL 5463418, at *12 (S.D.N.Y. June 29, 2007) (quoting *Sullivan*, 526 U.S. at 49).

With respect to Plaintiff's allegations arising out of the "smear campaign," Plaintiff's Section 1983 claim fails because she does not adequately allege state action. Specifically, Plaintiff has not provided facts plausibly suggesting that the alleged acts associated with the alleged campaign were an exercise of "power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *West*, 487 U.S. at 49 (internal quotation marks omitted). To the contrary, any citizen can communicate with others to encourage those others to vote in a particular way.

Defendant Trumper is the only named Defendant who is actually alleged to have distributed any of the four complained-of documents. Plaintiff claims Trumper sent two emails, dated May 2, 2012 and May 8, 2012 (the "Trumper Emails"), "with the approval, directive and/or direction of [the Defendants] and the use of District (public) resources/funds, in retaliation for [Plaintiff's] raising matters of public concern . . . ." (AC ¶ 24.) But she provides no facts supporting either the involvement of other Defendants or the dissipation of public resources in connection with the emails. Indeed, her conclusory allegations of state action are belied by the documents themselves. (*Id.* Ex. A.) The Trumper Emails were sent from a private email address, "jen_trumper@hotmail.com," to a list of various, seemingly private, email addresses. After her signature – "Jen Trumper," in the May 2, 2012 email, and "Jen," in the May 8, 2012 email – Trumper includes the phrase, "Any problem you can't solve with a good guitar is either unsolvable or isn't a problem." (*Id.*) The emails nowhere refer to Trumper's own position on the Board. It is impossible, based on the face of the documents or otherwise, to infer that these emails had their source in public funds or resources. *See Rogers v. DeJoseph*, 537 F. Supp. 2d

327, 330-31 (D. Conn. 2008) (defendant not acting under color of state law where he did not invoke power of his office or the state in any way in order to engage in complained-of conduct). Accordingly, Plaintiff has failed to allege, and the emails themselves belie, that Trumper was "clothed with the authority" of the state and thus acting under color of state law when she sent the emails. *See Back v. Hastings on Hudson Union Free Sch. Dist.*, 365 F.3d 107, 122 (2d Cir. 2004).

The next email cited by Plaintiff appears to have been sent on May 4, 2012, by an individual named Lee Ann Ader – who is not a party to this action, nor alleged to be a District employee or District Board Member – from the email address "leeann1027@optonline.net" (the "Ader Email"). (*Id.* Ex. B.)  The email then appears to have been forwarded to various other individuals, also not parties to this action. (*Id.*)  Like the Trumper Emails, there is no indication on the face of the Ader Email, nor supportive facts in the AC, that give rise to an inference that the email was sent using District resources or by someone clothed with the authority of state law.

Next, the campaign flyer, the fourth document that Plaintiff contends perpetuated the "smear campaign," includes a notation attributing it to an organization called "Citizens to Protect Monroe-Woodbury Public Education from Special Interest Groups."  (*Id.* Ex. C.)  Plaintiff nowhere alleges, except in wholly conclusory fashion – and the face of the flyer gives no indication – that Defendants are or were affiliated with this organization, or otherwise responsible for the document.

In sum, Plaintiff does not offer a single fact to support her claim that any aspect of the "smear campaign" was connected to District employees or Board Members, other than Defendant Trumper.  And, with respect to the Trumper Emails, Plaintiff offers no facts to plausibly suggest that they involved state action.  Accordingly, even if Plaintiff could point to

some deprivation of a right resulting from the "smear campaign," her Section 1983 claim concerning that deprivation would fail because she cannot show state action.

The other alleged instances of retaliation – CLF's mistreatment and the Mehrhof Email – were plausibly perpetrated under the color of state law.  The allegations regarding CLF relate to decisions that would logically fall to District employees, and the Mehrhof Email, (*id.* Ex. D), does, in fact, appear to be sent from a District email account, addressed to District faculty and staff, and attributed to the "Superintendent of Schools," Defendant Mehrhof.  Although Plaintiff only plausibly pleads state action with respect to the CLF and the Mehrhof Email allegations, I will, for the sake of argument, include the "smear campaign" in the discussion below.

### b. Deprivation of a Right – First Amendment Retaliation

Assuming Plaintiff could show state action with respect to all of the complained-of conduct, a successful Section 1983 claim still requires her to show that she was deprived of a constitutional right.  *Sullivan*, 526 U.S. at 49-50.  Plaintiff claims that Defendants violated her First Amendment right to free speech by retaliating against her for raising matters of public concern.  (AC ¶ 41.)  In the Second Circuit, the elements of a First Amendment retaliation claim are dependent on the "factual context" of the case before the district court.  *Williams v. Town of Greenburgh*, 535 F.3d 71, 76 (2d Cir. 2008).  In the context of a private citizen's action against public officials, the plaintiff must show that:  "(1) [plaintiff] has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by [plaintiff's] exercise of that right; and (3) defendants' actions effectively chilled the exercise of [plaintiff's] First Amendment right," *Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001), or caused plaintiff to suffer some other concrete harm, *Dorsett v. Cnty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013).  Defendants challenge only the second element, arguing that Plaintiff has not

adequately alleged retaliatory intent.  Plaintiff's allegations in that regard "must be sufficient to support the inference that [her] speech played a substantial part in the adverse action."  *Davis v. Goord*, 320 F.3d 346, 354 (2d Cir. 2003) (internal quotation marks omitted); *see Smith v. Cnty. of Suffolk*, 776 F.3d 114, 118-19 (2d Cir. 2015); *El-Bey v. City of New York*, 419 F. Supp. 2d 546, 552 (S.D.N.Y. 2006).

At the outset, the Court notes that Plaintiff's AC is replete with naked assertions that Defendants' complained-of conduct was inflicted in retaliation for her public advocacy efforts set forth above.  These conclusory allegations of causation will simply not support a First Amendment retaliation claim.  *See Geiger v. Town of Greece*, No. 07-CV-6066, 2007 WL 4232717, at *9 (W.D.N.Y. Sept. 4, 2007) (causation not adequately pled by "purely conclusory" allegations).  Plaintiff's allegations regarding causation are mere "formulaic recitation[s]" of the causation element, *see Twombly*, 550 U.S. at 555, which do not give rise to an inference that Plaintiff's public advocacy beginning in 2008, up to and including her campaign for District Board in 2012, played a substantial part in the complained-of conduct.

As an initial matter, Plaintiff makes no specific allegation that any particular Defendant was aware of any particular Pre-Campaign or Campaign Statements, which, in itself, is fatal to Plaintiff's First Amendment claim.  *Pavone v. Puglisi*, 353 F. App'x 622, 625 (2d Cir. 2009) (summary order) ("[A] plaintiff must still allege [in addition to causation] that defendants were aware of the protected activity.").  The extent of Plaintiff's effort to demonstrate Defendants' awareness of her speech consists of substantially identical and entirely conclusory parenthetical notations following each allegation of fact describing the Pre-Campaign and Campaign Statements, to the effect that Plaintiff's conduct "was known by the [Defendants]."  (AC ¶¶ 17-22.)  I may infer, however, that Defendant Trumper was aware that Plaintiff was running for

office, and that the District Superintendent and District Board members who were presumably present at the "one (1) or more" Board meetings that took place "[i]n or about March and/or April 2011" at which Plaintiff spoke, (*id.* ¶ 18), were aware of her comments on that occasion or those occasions.  But even if Plaintiff could show all Defendants' awareness of all of Plaintiff's protected activity, Plaintiff's claim would still fail because she does not allege facts that lead to an inference of causation.

### (a) Plaintiff's Pre-Campaign Statements

There is no plausible causal connection between Plaintiff's Pre-Campaign Statements and the alleged adverse action of the "smear campaign," the alleged mistreatment relating to CLF or writing or sending the Mehrhof Email.  Accordingly, Plaintiff fails to establish a *prima facie* retaliation case.  *See Ruiz v. N.Y.C. Fire Dept.*, No. 00-CV-4371, 2001 WL 767009, at *4 (S.D.N.Y. July 9, 2001) ("[T]o establish a *prima facie* case of retaliation, plaintiff would have to allege . . . a causal connection between her protected activity and the adverse action or actions.").

First, "[s]uch a causal connection may be demonstrated directly by showings of retaliatory animus," *id.*, but Plaintiff's AC includes no such showing.  Plaintiff provides no facts suggesting a direct connection between the Pre-Campaign Statements and the allegedly retaliatory acts, such as reference to the Pre-Campaign Statements, or any other discernible relationship to that speech.  Second, the temporal proximity between the Pre-Campaign Statements and the alleged retaliation does not indirectly demonstrate a connection.  A plaintiff can "indirectly establish a causal connection to support a . . . retaliation claim by 'showing that the protected activity was closely followed in time by the adverse [] action.'"  *Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cnty.*, 252 F.3d 545, 554 (2d Cir. 2001) (quoting *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996)).  There is no bright line rule for

temporal proximity between an adverse act and the protected conduct that would, or would not, lead to an inference of causation. *See Burkybile v. Bd. of Educ.*, 411 F.3d 306, 314 (2d Cir. 2005) (Second Circuit "has not established a specific delay between protected activity and adverse . . . action that defeats an inference of causation," and has previously found a delay of three months to be fatal to finding of causation, and eight months sufficient to support causation).

Plaintiff states that her Pre-Campaign Statements began in approximately 2008, (AC ¶ 17), and concluded at an unstated date prior to May 12, 2012, (*id.* ¶ 21), but gives May 2011 as the most recent date for engaging in such activity, (*id.* ¶ 19). After the "For Those Who Care" meeting, which was "[i]n or about May 2011," Plaintiff does not specify any protected speech. She identifies the first instance of alleged retaliation as occurring "[i]n or about April and/or early to the middle of May 2012," with the start of the "smear campaign," apparently marked by the May 2, 2012 Trumper Email. (*Id.* ¶ 23.)

Without more, the approximately one-year – or longer – gap between the most recent date Plaintiff provides for a Pre-Campaign Statement (May 2011) and the Defendants' first alleged instance of retaliatory conduct (May 2, 2012) does not support an inference of causation. *See Fotopolous v. Bd. of Fire Comm'rs of Hicksville Fire Dist.*, 11 F. Supp. 3d 348, 368 (E.D.N.Y. 2014) ("[T]he span of one year between Plaintiff's protected conduct and the adverse actions taken against him is too attenuated to support an inference of retaliation"); *see also Stringfellow v. Wyckoff Heights Med. Ctr.*, No. 95-CV-3041, 1998 WL 760286, at *6 (E.D.N.Y. Sept. 9, 1998) (for Title VII retaliation claim, four months was too long an interval to infer causal connection). It is even more implausible to think that in 2012 Plaintiff was suddenly

retaliated against for the statements she made earlier in 2011 or in 2008 or 2009, which predated the adverse actions up to four years.

And, in any event, as noted earlier, because the "smear campaign" is not state action, Plaintiff has to allege a plausible causal connection between the Pre-Campaign Statements and the alleged mistreatment of CLF, which occurred after the election on unspecified dates, (*id.* ¶¶ 27-28), and the May 13, 2013 Mehrhof Email, sent approximately one year after the election, (*id.* ¶ 32). These even more temporally attenuated events do not permit a plausible inference of causal connection. *See, e.g.*, *Burkybile*, 411 F.3d at 314 (passage of more than a year between protected activity and alleged retaliation, among other factors, "destroy[ed] any inference of retaliatory animus").

Moreover, it is obvious from the content of the "smear campaign" documents that they relate to Plaintiff's campaign for District Board, not her earlier speech. The Trumper Emails nowhere reference any of Plaintiff's protected activities detailed in the AC, but rather urge recipients to vote for Trumper's preferred slate of candidates and against Plaintiff's. The notion that this email was motivated by anything other than the election is implausible based on both the face of the email and the contents of Plaintiff's AC.

The Ader email states, in relevant part, "[t]he community of Kiras [*sic*] Joel in Orange County is seeking several spots on the MW School Board . . . PLEASE PLEASE PLEASE vote on May 15, 2012 to defeat them!" (*Id.* Ex. B.) Plaintiff's name is not mentioned in the email, and Plaintiff fails to identify any relevant relationship between herself and the sender, whose name Plaintiff does not mention anywhere in the AC. For the same reasons as the Trumper Emails, nothing supports Plaintiff's assertions that the email relates to Plaintiff's Pre-Campaign Statements.

With respect to the campaign flyer, the print in the largest font reads, "Don't be DECEIVED!  Don't let Special Interests Succeed!"  Although the flyer includes Plaintiff's name, along with two other candidates, it makes no mention of Plaintiff's Pre-Campaign Statements. (*Id.* Ex. C.)  Based on the content of the document, the only logical inference is that its dissemination was prompted by Plaintiff's campaign.  An inference of retaliatory intent is rendered even more implausible by the fact that the two other candidates mentioned alongside Plaintiff are not alleged to have engaged in the protected activity to which Plaintiff attributes the retaliation.  That any one of these four "smear campaign" documents was generated with retaliatory intent based on Plaintiff's Pre-Campaign Statements is simply not plausible.

Similarly, the content of the 2013 Mehrhof Email makes no reference to Plaintiff's Pre-Campaign Statements.  In the email, Mehrhof apologizes for the behavior of Plaintiff, whom he claims attended a faculty-appreciation reception and "distribut[ed] negative campaign literature" to the event's attendees.  (*Id.* Ex. D.)  Mehrhof explained that he found "the incident disrespectful to the employees and parents who were there to show their appreciation for the hard working faculty and staff who take care of their children."  (*Id.*)  Because Plaintiff provides no additional facts that undermine the facial connection of the email to Plaintiff's conduct at the reception, or otherwise give rise to an inference of causal connection, Plaintiff's allegations of retaliation with respect to the Mehrhof Email, too, are implausible.

### (b)  Plaintiff's Campaign Statements

#### (i) *The Campaign Statements and the "Smear Campaign"*

Plaintiff argues that the "smear campaign" was launched, in part, in retaliation for Plaintiff's Campaign Statements.  (*Id.* ¶ 23.)  The Court understands the gravamen of this argument to be that Defendants' criticism of Plaintiff's candidacy for District Board, by

15

encouraging voters to vote against Plaintiff, amounts to an actionable First Amendment retaliation claim.  While there is close temporal proximity between the April or May 2012 Campaign Statements and the May 2012 "smear campaign," there is no plausible adverse action, because the sort of speech of which Plaintiff complains – essentially, campaign speech that "retaliates" for campaign speech – is not actionable.

The Court has not found a case explicitly addressing the question of whether, when a political candidate speaks in furtherance of his or her campaign, and public officials respond in a critical, skeptical or hostile manner, the candidate then has an actionable First Amendment retaliation claim.  That may be because no plaintiff has brought such a claim.  But accepting Plaintiff's argument would mean that every political campaign could end in litigation in federal court.  It seems clear, based on analogous First Amendment principles, that Plaintiff's argument must be rejected.

Several courts have espoused the view that the First Amendment does not protect individuals in the political arena from "retaliation by their foes for their position on matters of public concern."  *Van De Yacht v. City of Wausau*, 661 F. Supp. 2d 1026, 1036 (W.D. Wis. 2009) (agreeing with decisions from the First and Second Circuits sharing this view).  In *Romero-Barcelo v. Hernandez-Agosto*, 75 F.3d 23 (1st Cir. 1996), the former governor of Puerto Rico, having just lost his reelection campaign, claimed that elected members of the Puerto Rico Senate violated his First Amendment rights when they held investigative hearings to link the former governor with illegal activity.  The First Circuit rejected this claim, finding that the First Amendment does not protect "a politician whose rights to freedom of speech, freedom of association, and freedom to disassociate [oneself] from unpopular views have been injured by

other politicians seeking to undermine his credibility within his own party and with the electorate." *Id.* at 34 (internal quotation marks omitted and alteration in original).

In *Camacho v. Brandon*, 317 F.3d 153 (2d Cir. 2003), the Second Circuit held that the retaliatory firing of a city council staffer because of the exercise of First Amendment rights by her boss, a city council member, was not actionable. The court found that because Plaintiff's boss was a policymaker, Plaintiff did not have an actionable First Amendment retaliation claim based on adverse acts taken as a result of either the boss's political associations or votes. *See id.* at 162. The court also noted the *Romero-Barcelo* decision with approval, observing that if that court had found plaintiff's claims to give rise to a First Amendment claim, "it would have subjected to judicial review all sorts of politically motivated conduct committed within the confines of legislatures and best left within the legislative sphere." *Id.* at 161.

In *Blair v. Bethel Sch. Dist.*, 608 F.3d 540 (9th Cir. 2010), the plaintiff – the former vice president of the local school board – claimed that his civil rights were violated when his fellow board members voted to remove him as vice president, but not as a board member, as a result of his relentless criticism of the district's superintendent. The Ninth Circuit held that plaintiff's removal, although "undoubtedly stemm[ing] from his contrarian advocacy . . . did not amount to retaliation in violation of the First Amendment." *Id.* at 546. In so holding, the court found that, while the First Amendment protects plaintiff's "discordant speech as a general matter . . . it does not, however, immunize him from the political fallout of what he says." *Id.* at 542. The court noted that it was uncontested that (1) plaintiff's statements criticizing the superintendent were protected by the First Amendment; (2) those statements were the cause for the board's decision to remove him from the vice president position; and (3) those board members were "state actors." *Id.* at 543. But, the court found, the case "is not a typical First Amendment retaliation

17

case.  What's different here is the 'adverse action' [plaintiff] is challenging was taken by his peers in the political arena."  *Id.* at 544.

Though the facts in these cases are distinguishable from the facts of the case before this Court, *Blair*, *Camacho* and *Romero-Barcelo* all share a fundamental premise that the political arena is a unique setting where ordinary notions of First Amendment protection sometimes yield to the political nature of democratic governance.  That is, these cases acknowledge a distinction between permissible retaliation among politicians in pursuit of their political agendas, and actionable retaliation in violation of the First Amendment.  *See Blair*, 608 F.3d at 543-44 (noting that "we *expect* political officials to cast votes in internal elections in a manner that is, technically speaking, retaliatory," and agreeing with the district court that "the First Amendment doesn't shield public figures from the give-and-take of the political process") (emphasis in original).

In the present case, the alleged "smear campaign" arises from run-of-the-mill campaign literature encouraging people to vote for one candidate over another based on a candidate's alleged affiliations or agenda.  While the tone may be a little nastier than is usually seen in small-town elections, there is no denying that hostile and accusatory comments are a common part of the electoral process in this country.  This type of routine campaign speech must escape the reach of a viable First Amendment retaliation claim.  It would undermine our fundamental democratic process if incumbents risked lawsuits for responding to the arguments, connections or positions of candidates, or for urging others to vote for or against a particular candidate.  Just as in the run-up to the 2008 U.S. presidential election, Candidate Obama could not have sued President Bush for urging the public to vote for Candidate McCain, Plaintiff here cannot sue Board member Trumper for urging others to vote for Plaintiff's opponent – even if in both instances one could

18

argue that the incumbent treated the challenger adversely because of the challenger's protected expression.  The shield provided to elected officials from First Amendment retaliation claims stemming from their politically motivated actions against fellow politicians is no less important to ensuring accountability, quality and responsiveness in campaigns than it is to ensuring the same for the legislative process.  *Cf. Blair*, 608 F.3d at 545 (noting that the court "conceive[d] little difference between [the school Board's internal vote and a public election].  [I]t wouldn't have been controversial in the least – and certainly not a violation of the First Amendment – had Blair's constituents refused to support his reelection on account of his outspoken opposition . . . .").

Cases finding unconstitutional certain statutes prohibiting misleading statements in campaigns lend further support to the notion that campaign speech in response to campaign speech does not give rise to a First Amendment claim.  In *Winter v. Wolnitzek*, No. 14-CV-119, 2014 WL 5486228 (E.D. Ky. Oct. 29, 2014), the court struck down two state regulations – one that prohibited judicial candidates from "campaign[ing] as a member of a political organization" and one that prohibited judicial candidates from "misrepresent[ing] any candidate's identity, qualifications, present position, or mak[ing] any other false or misleading statements."  *Id.* at *2.  The court found that the ban on campaigning as a member of a political organization – which was implemented, in part, to prevent speech that "misleads voters" – was not narrowly tailored and therefore failed a strict scrutiny analysis.  In arriving at that conclusion, the court observed:

> [T]he remedy for misleading speech is more speech, not less. . . . If one judicial hopeful says, I am the best Republican for the job, would censorship or more speech better serve the public?  The answer is more speech.  Our Founders wisely left to the public . . . the weighty determination of whether political speech is true or misleading.

*Id*. at *10 (citing *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring)); *see Brown v. Hartlage*, 456 U.S. 45, 60 (1982) (statute that prohibited candidates from offering benefits to voters was unconstitutional as applied to limit candidate's campaign speech; "barring certain public statements [in the electoral context] runs directly contrary to the fundamental premises underlying the First Amendment as the guardian of our democracy. . . . [T]he people are to choose between good ideas and bad, and between candidates for political office.").  Thus, it is the electorate – not a court – that is the proper arbiter of the propriety of campaign speech.

Further, the *Winter* court held that the canon prohibiting "false or misleading statements" would "prohibit a whole host of possibly misleading speech that is constitutionally protected." *Id.* at *12.  The court illustrated its holding:

> [T]ake Muhammad Ali's statement [and put it in the context of a] political election:  'I am the greatest candidate' and 'My opponent is the worst/a bad/the wrong candidate.'  Are those statements misleading?  It depends . . . .  Could a voter be misled by that speech?  Maybe. . . . And again in [a] hypothetical race between two Republicans, one might say 'I'm a real Republican' or 'I have true conservative values.'  The candidate might claim his opponent 'is not like you and me' or 'is not a friend of the middle class.'   All of that speech could be misleading, and all of it is constitutionally protected.

*Winter*, 2014 WL 5486228, at *12.  Drawing support for its reasoning from the Supreme Court's decision in *Brown v. Hartlage* the Winter court explained that, "[e]ven false statements, which are 'inevitable in free debate,' especially political debate, must have some protection so that freedom of speech has the 'breathing space' necessary 'to survive.'"  *Id.* at *10 (quoting *Brown*, 456 U.S. at 60); *see Weaver v. Bonner*, 309 F.3d 1312, 1319 (11th Cir. 2002) (finding a judicial canon unconstitutionally overbroad because it "prohibit[ed] false statements negligently made and true statements that are misleading or deceptive, [and] does not afford the requisite 'breathing space' to protected speech.").  Because speech of this sort – even false statements that

could arguably be characterized as a "smear campaign" – is constitutionally protected, it cannot be considered adverse action for purposes of a First Amendment retaliation claim, and it would raise serious constitutional questions if the rule were otherwise.  Just like any other citizens, incumbents must be free to "trash" the other side in an election.

All of this is to say that "more is fair in electoral politics than in other contexts."  *Blair*, 608 F.3d at 544.  Numerous courts have acknowledged the unique rhetorical atmosphere of the political arena.  *See e.g.*, *Zherka v. Amicone*, 634 F.3d 642, 647 (2d Cir. 2011) ("The arena of political discourse can at times be rough and tough.  Public officials must expect that their decisions will be subjected to withering scrutiny from the populace."); *Mattox v. City of Forest Park,* 183 F.3d 515, 522 (6th Cir. 1999) (First Amendment claim not actionable; "[p]ublic officials may need to have thicker skin than the ordinary citizen when it comes to attacks on their views."); *Colson v. Grohman,* 174 F.3d 498, 514 (5th Cir. 1999) (defendants' "allegedly retaliatory crusade" did not support First Amendment retaliation claim because it "amounted to no more than the sort of steady stream of false accusations and vehement criticism that any politician must expect to endure"); *Zilich v. Longo* 34 F.3d 359, 363 (6th Cir. 1994) ("The First Amendment is not an instrument designed to outlaw partisan voting or petty political bickering through the adoption of legislative resolutions."); *Footit v. Van De Hey*, No. 04-CV-459, 2005 WL 1563334, at *5 (E.D. Wis. June 29, 2005) (politician was "not entitled to sue his political opponents just because he thinks their motivation for accusing him of misconduct was not pure.").

It simply cannot be that every candidate who subjects herself to the rough-and-tumble of electoral politics has an actionable First Amendment retaliation claim against her opponents who hold public office.  When an individual makes the decision to enter the public arena as a political

21

candidate, she enters an inherently adversarial and controversial environment.  A candidate must accept the increased attention, criticism, scrutiny and even smears that come along with that decision.  "[T]he First Amendment does not succor casualties of the regular functioning of the political process."  *Blair*, 608 F.3d at 545.  In the present case, it is clear that the complained-of "smear campaign" consisted of political opposition to Plaintiff's candidacy for public office.  Accordingly, it does not – and, in maintaining the integrity of a free electoral process, cannot – support an actionable First Amendment retaliation claim.

(ii) *The Campaign Statements and CLF*

With respect to the events involving CLF, Plaintiff offers no facts suggesting either a direct or circumstantial connection between her Campaign Statements and the alleged retaliation.  First, Plaintiff's AC alleges simply, "defendants would not comply with [Plaintiff's] request that the District provide/allow home schooling to plaintiff's daughter, a District student."  (AC ¶ 27.)  Plaintiff provides no information regarding what home-schooling arrangements were requested and why, or whether CLF was entitled to home schooling at all.  Second, Plaintiff alleges that defendants failed to discipline certain students who "committed assault and battery" against CLF.  (*Id.* ¶ 28.)  Plaintiff, again, provides no information regarding this claim, including the nature of the altercation with the other students, and whether it was the sort of altercation that ordinarily would result in discipline.  Accordingly, Plaintiff provides insufficient facts to infer anything improper about the District's handling of either incident.  Nor does she provide facts suggesting that other students were treated more favorably than CLF.  Further, there is no allegation that any individual defendant was involved in CLF's home-schooling decision or the events surrounding the altercation with another student.  And, further demonstrating the lack of plausibility of Plaintiff's claim, she fails to provide facts indicating that any of the people who

22

were involved in the home-schooling decision, or the decision not to discipline students involved in the altercation, were aware of Plaintiff's relevant speech.  Lastly, because Plaintiff does not provide dates for either the home-schooling decision or the "assault and battery," it is impossible to infer a causal connection based on temporal proximity.

(iii)  *The Campaign Statements and the Mehrhof Email*

Finally, Plaintiff's allegations regarding the Mehrhof Email, like the other allegedly retaliatory documents cited in Plaintiff's AC, is unaccompanied by any facts suggesting a direct or circumstantial connection between the Campaign Statements and the email.  Plaintiff offers nothing tending to show that the email was sent in response to anything other than Plaintiff engaging in the activity described in the email – that is, distributing campaign literature at a teacher-appreciation reception.[1]  Further, the email was sent approximately one year after Plaintiff's most recent Campaign Statement, and thus lacks the temporal proximity to even circumstantially connect the speech and the email.  *See Hollander v. Am. Cyanamide Co.*, 895 F.2d 80, 85-86 (2d Cir. 1990) (three-month period between protected activity and alleged retaliatory conduct does not, alone, meet the "requirement of a causal nexus").  It seems obvious that the Mehrhof Email was prompted by Plaintiff's behavior at the reception, not the public advocacy she engaged in between one and five years earlier.

As a general matter, Plaintiff's AC is fatally infected with conclusory statements.[2]  None of Plaintiff's allegations, accepted as true and taken together, allows an inference that any

---

[1] Although Plaintiff argues the email was false, she does not specify in what respect it was false, or otherwise deny the conduct of which she was accused in the email.

[2] For example, among Plaintiff's sweeping allegations, her only accusation of retaliatory conduct on the part of Defendants Cauthers or DiGeronimo is the entirely conclusory claim that they "had a policy and/or custom of retaliating against private citizens for raising matters of public concern . . . ."  (AC ¶ 11.) Although Plaintiff also states that Defendant Cauthers "distributed a libelous/defamatory email about [Plaintiff]," it is obvious that he did so in his capacity as CIO "on behalf of Mehrof [*sic*]," (*id.* ¶ 32), and

actionable conduct by Defendants was prompted by her protected expression.  Accordingly,

Plaintiff has failed to plead an essential element of her First Amendment retaliation claim, which

must, therefore, be dismissed.  *See Twombly*, 550 U.S. at 570 (complaint will be dismissed where

plaintiff fails to provide sufficient facts to "nudge[] [her] claims across the line from conceivable

to plausible").

### 2. *Monell* Claim

Having established that Plaintiff fails to state a claim for a constitutional violation, there

is no need for this Court to address her claim under *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658

(1978).  *See Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) (affirming district

court's decision not to address municipal defendants' liability after finding no underlying

constitutional violation).[3]

---

even though Plaintiff appears to attribute the content of the email to Cauthers, the words clearly are
Mehrhof's, (*see id.* Ex. D).

[3] Even if Plaintiff were able to establish the elements of a First Amendment claim, Plaintiff's *Monell*
claim would fail.  Plaintiff makes the naked assertion that Defendants "had a policy and/or custom of
retaliating against private citizens for raising matters of public concern criticizing certain District
practices . . . ."  (*Id.* ¶ 11.)  But Plaintiff fails to make a single factual allegation supporting:

> (1) the existence of a formal policy officially endorsed by the municipality; (2)
> actions taken or decisions made by municipal officials with final decision making
> authority, which caused the alleged violation of plaintiff's civil rights; (3) a
> practice so persistent and widespread that it constitutes a custom of which
> constructive knowledge can be implied on the part of the policymaking officials;
> or (4) a failure by policymakers to properly train or supervise their subordinates,
> amounting to 'deliberate indifference' to the rights of those who come in contact
> with the municipal employees.

*Saenz v. Lucas*, No. 07-CV-10534, 2008 WL 2735867, at *5 (S.D.N.Y. July 9, 2008).  Mehrhof may well
be a policymaker but his email did not, as discussed above, violate Plaintiff's rights.  Plaintiff's
allegations amount to mere recitations of the elements of *Monell* liability.  (*See* AC ¶¶ 11-14.)
Accordingly, she fails to establish the existence of a municipal policy or custom, and her "boilerplate
*Monell* claim" must be dismissed because it "do[es] not rise to the level of plausibility."  *Santiago v. City
of New York*, No. 09-CV-856, 2009 WL 2734667, at *3  (E.D.N.Y. Aug. 25, 2009); *see Guzman v. United
States*, No. 11-CV-5834, 2013 WL 5018553, at *4 (S.D.N.Y. Sept. 13, 2013).

### 3. State-Law Claim

The "traditional 'values of judicial economy, convenience, fairness, and comity'" weigh in favor of declining to exercise supplemental jurisdiction where all federal-law claims are eliminated before trial. *Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) (quoting *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988)). Having determined that all of the claims over which this Court has original jurisdiction should be dismissed, I decline to exercise supplemental jurisdiction over Plaintiff's remaining state-law cause of action (Plaintiff's "2nd Causes [*sic*] of Action"). *See id.* (citing 28 U.S.C. § 1367(c)(3)).

### C. Leave to Amend

Also before the Court is Plaintiff's Cross-Motion to Amend her AC. Leave to amend is ordinarily freely granted when a motion to dismiss is granted. *See Bellikoff v. Eaton Vance Corp.*, 481 F.3d 110, 118 (2d Cir. 2007); *Cohen v. Citibank, N.A.*, No. 95-CV-4826, 1997 WL 88378, at *2 (S.D.N.Y. Feb. 28, 1997). Leave may be denied, however, where amendment would be futile. *Malester v. Adamo*, No. 09-CV-9374, 2010 WL 5065865, at *4 (S.D.N.Y. Dec. 8, 2010) ("A motion for leave to amend should be denied when allowing such an amendment would be futile in that it could not withstand a motion to dismiss for failure to state a claim.").

Here, the Court granted Plaintiff leave to make her cross-motion so that Plaintiff could address a new argument regarding her state-law defamation claim, which argument was included in Defendants' motion but not mentioned in Defendants' pre-motion letter. Plaintiff was not granted leave to move to amend so that she could have a third bite at her First Amendment claim. Plaintiff already had the opportunity to amend her First Amendment claim after the deficiencies in her original complaint, and the bases upon which Defendants were going to seek dismissal, were identified for her both by the Court at a December 20, 2014 pre-motion conference and in

Defendants' pre-motion letter, (Doc. 12).  Plaintiff provides no explanation as to why her AC failed to cure the original complaint's deficiencies, yet requests a third opportunity to bring a viable First Amendment claim.  The Court warned Plaintiff at the pre-motion conference that she would not be given another opportunity to amend, in an effort to avoid this exact situation, (*see* Declaration of Garry T. Stevens Jr., (Doc. 29, Ex. A, at 3, 9):  Defendants and the Court wasting time and resources dealing with a motion to dismiss, only to have to address another amended complaint.

That Plaintiff was provided with notice of, and an opportunity to cure, her pleading deficiencies, and subsequently failed to do so is, alone, sufficient ground to deny leave to amend. *See e.g.*, *Coleman v. brokersXpress, LLC*, 375 F. App'x 136, 137 (2d Cir. 2010) (summary order) (no abuse of discretion where district court, after once granting leave to amend, denied a second opportunity because plaintiff could not show how he would cure defects); *Ruotolo v. City of New York*, 514 F.3d 184, 191-92 (2d Cir. 2008) (affirming denial of leave to amend "given the previous opportunities to amend"); *In re Eaton Vance Mut. Funds Fee Litig.*, 380 F. Supp. 2d 222, 242 (S.D.N.Y. 2005) (denying leave to amend because "the plaintiffs have had two opportunities to cure the defects in their complaints, including a procedure through which the plaintiffs were provided notice of defects"), *aff'd sub nom. Bellikoff* 481 F.3d at 118 (plaintiffs "were not entitled to an advisory opinion from the Court informing them of the deficiencies in the complaint and then an opportunity to cure those deficiencies") (citations and internal quotation marks omitted).

In any event, an analysis of Plaintiff's PAC reveals that allowing another amendment would be futile.  Amendment is futile when the claim as amended cannot "withstand a motion to dismiss pursuant to Rule 12(b)(6)," and "[i]n deciding whether an amendment is futile, the court

26

uses the same standard as those governing the adequacy of a filed pleading." *MacEntee v. IBM,* 783 F. Supp. 2d 434, 446 (S.D.N.Y. 2011) (internal quotation marks omitted). Where the problem with a claim "is substantive . . . better pleading will not cure it," and "[r]epleading would thus be futile." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000). Accordingly, because Plaintiff's PAC cannot survive a motion to dismiss pursuant to 12(b)(6), as discussed below, leave to amend would be futile, and is therefore denied.

Plaintiff's PAC is still largely conclusory. For example, Plaintiff did practically nothing to change the conclusory nature of the *Monell* claim in her PAC.[4] Similarly, Plaintiff's wholly conclusory additions of DiGeronimo's and Cauther's names into two revised paragraphs of her PAC amount to naked assertions of retaliation and still fail to establish that they were personally involved in any of the complained-of activity. (PAC ¶¶ 24, 27.) Nor does the PAC meaningfully expand on how the actions of the other Defendants amount to retaliation.

The only non-conclusory changes relate to additional details regarding CLF, and additional speech in the form of a June 12, 2012 petition Plaintiff filed with the New York State Education Department (the "NYSED Petition") – mentioned for the first time in, and attached to, the PAC, (Santos Decl., Ex. 2). Although Plaintiff finally provides dates associated with the mistreatment of CLF referenced in her AC, and describes new retaliatory events involving CLF, the factual allegations with respect to CLF in the PAC are still insufficient to survive a motion to dismiss. Specifically, Plaintiff claims for the first time that: the District, prior to May 12, 2012, allowed CLF home-schooling accommodations, and refused to continue providing those accommodations "[i]n or about the end of May 2012," (PAC ¶¶ 33, 34); CLF was disciplined, on

---

[4] As is symptomatic of nearly all of Plaintiff's claims, Plaintiff's *Monell* claims change in a meaningless way from her AC to her PAC. She tinkers with some of the language but still fails to provide any facts supporting her wholly conclusory assertions. (*Compare* AC ¶¶ 10-14 *with* PAC ¶¶ 10-11.)

an unknown date, by a teacher who allegedly made her sit outside the classroom, (*id.* ¶ 35); a

student placed his hand on CLF's neck in December 2012 and was not disciplined, (*id.* ¶¶ 39-

40); a student tried to "crush" CLF's hand in January 2013 and was also not disciplined, (*id.* ¶

41); and, approximately one year later, in "January or February 2014," a fellow student spilled

Gatorade on CLF and was not disciplined, (*id.* ¶ 42).

All of these claims fail to raise an inference of retaliatory intent because Plaintiff

continues to offer no facts, such as a single reference to Plaintiff's speech, plausibly suggesting a

connection between her speech and the alleged retaliation.  And, even with the addition of

relevant dates, a circumstantial connection based on temporal proximity can be inferred only

with respect to the May 2012 Campaign Statements and the May 2012 decision to alter CLF's

home-schooling accommodations.  The intervening six to eight months between the May 2012

Campaign Statements or the June 2012 NYSED Petition, and either of the disciplinary decisions

in December 2012 or January 2013, or the teacher's discipline of CLF at an unknown date, is

insufficient to circumstantially connect Plaintiff's activity with the alleged retaliation.  *See

Wilson v. Mabus*, No. 13-CV-232, 2014 WL 4229996, at *4 (D.D.C. Aug. 25, 2014)

(approximately four months between the adverse action and protected activity is "too far

removed" to infer causation).

Further, the close temporal proximity between Plaintiff's Campaign Statements and the

decision to discontinue CLF's home-schooling accommodations in May 2012, without more,

cannot give rise to a plausible inference of retaliation.  Like Plaintiff's PAC, her AC contains no

facts regarding why CLF was initially given the home-schooling accommodation, what entitled

her to have the home-schooling continued, whether anything had changed in the interim, what

the stated reasons for the District's decision to change home-schooling accommodations were

and whether they were true or false, or how other similarly situated students were treated. There is simply no way to infer that there was anything adverse or unfair about the decision. Similarly, Plaintiff does not provide context for the CLF altercations or indicate whether the reactions to those events, including the disciplinary decisions, were out of the mainstream.

Even assuming the events were adverse, and even if Plaintiff could show close temporal proximity between her relevant speech and any of the December 2012, January 2013, or January/February 2014 disciplinary decisions, Plaintiff still does not point to facts that could lead to a plausible inference that any of the District employees who dealt with, or were responsible for, those decisions or the home-schooling decision were aware of Plaintiff's relevant speech. And, as to all of the allegations regarding CLF, there is still no indication that any named Defendant (except the District itself) was responsible. Accordingly, "[i]n the absence of any identification of how a further amendment would improve upon the [AC]," leave to amend is denied as futile. *In re WorldCom, Inc. Sec. Litig.*, 303 F. Supp. 2d 385, 391 (S.D.N.Y. 2004).

### III.  Conclusion

For the reasons stated above, Defendants' Motion to Dismiss is GRANTED. All of Plaintiff's First Amendment retaliation claims are DISMISSED with prejudice.[5] Plaintiff's state-law claim is DISMISSED without prejudice. Plaintiff's Cross-Motion for leave to amend and Motion for Conference are DENIED. The Clerk of Court is respectfully directed to terminate the pending motions, (Docs. 23, 26, 33), and close the case.

---

[5] Because I am not granting leave to amend, I need not address Defendants' request that, if the Court allowed a third amendment, it award to Defendants their attorneys fees incurred in opposing Plaintiff's first two complaints. (*See* Doc. 30, at 16.)

**SO ORDERED.**

DATED:      White Plains, New York
                March 25, 2015

_____
                              Cathy Seibel, U.S.D.J.